1

2

3

4

5

6

7

8 IN THE UNITED STATES DISTRICT COURT

9 FOR THE EASTERN DISTRICT OF CALIFORNIA

10 JOHN FRANKLIN TAYLOR,

11           Petitioner,               No. CIV S-03-0477 MCE KJM P

12     vs.

13 TOM L. CAREY, Warden,

14          Respondent.        FINDINGS AND RECOMMENDATIONS

15 _____/

16         Petitioner is a state prison inmate proceeding pro se with a petition for a writ of

17 habeas corpus under 28 U.S.C. § 2254.  He challenges his Sacramento County convictions for

18 attempted murder, murder and weapons enhancements.

19 I. Facts

20         In May 1997 Robert Swafford was dating Rena Tabarez.  RT 511-512.  Through

21 Rena or her half-sister Maria Aguilar, Swafford had met their mother, Virginia Nuno, petitioner

22 and co-defendants Matt Michel (petitioner's half-brother), Enrique (Rick) Carrillo and Michael

23 Brown.  RT 514-515, 587-588.  Carrillo called Nuno "mother" and referred to Aguilar and

24 Tabarez as his sisters.  RT 617.

25         Swafford spent Mother's Day with Tabarez and Nuno at a barbecue at Folsom

26 Lake.  RT 545.  Michel and Brown were also there with Aguilar.  RT 545-546, 590.  Nuno's van

1

got a flat tire at the lake and Swafford offered to help Michel fix it.  RT 547, 591.  Michel said

something like "fool, grab the tire."  RT 547.  This angered Swafford, but Michel retorted that

Swafford should not have called him "loke," apparently short for "local."  RT 548.  After this

exchange of words, Michel left.  RT 548.

On May 24, Swafford attended a family baptism with Tabarez.  RT 515.  On the

way to the baptism, they picked up Swafford's friend Chris Guerrero.  RT 516-517.  Swafford

was driving his brown Cadillac.  RT 518.  The four defendants (including petitioner) also

attended the baptism.  RT 521, 595.  There were no problems between Swafford and any of the

defendants at the baptism.  RT 564, 580.

Nuno, Tabarez, Swafford and Aguilar eventually went to a bar, Yolanda's

Lounge.  RT 520.  The defendants also went to Yolanda's.  RT 521.  Again, there were no

problems between Swafford and Guerrerro and any of the defendants.  RT 564, 580.  Swafford's

group left sometime after midnight; although Swafford was intoxicated, he drove anyway.

RT 525.  He made a U-turn at one point to head back to Yolanda's but Tabarez told him to go to

Nuno's, so he made another U-turn.  RT 604.  During one of the turns he went over the center

divider.  Tabarez saw the defendants' car next to them; Carrillo was yelling for them to pull over.

RT 604, 605, 662.

When they arrived at Nuno's house on Edinger Way, Swafford and Tabarez got

out to help Nuno out of the car.  RT 532, 608.  Before they could do so, Carrillo came up from

behind his car.  RT 533, 608.  Carrillo was angry about the way Swafford had been driving with

Nuno in the car.  RT 535, 612.  Swafford, intoxicated, "mouthed off back."  RT 535.  Carrillo

then helped Nuno out of the car and into her house.  RT 536.

According to defense witness Rick Trejo,[1] he arrived at Nuno's house with Brown

and Aguilar in Aguilar's car.  RT 1493, 1498-1499.  Aguilar was angry that Swafford had been

---

[1]  Trejo was a witness for Brown.

1   driving recklessly with her mother in the car.  RT 1496-1497, 1501.  She hit Swafford, who hit

2   her back.  RT 1502-1503.

3          Swafford took his shirt off in preparation for a fight; he was, however, unarmed.

4   RT 536, 550.  Tabarez was able to get both men to back off.  As she pushed Carrillo across the

5   street, Carrillo said "Fool, you hit my sister."  RT 536-537, 617.  Swafford saw two shadows

6   come out of the car.  RT 538.  Tabarez saw Michel step forward, say something and then begin

7   firing a gun.  RT 616.  Tabarez ran forward to get out of the line of fire and crouched by a fence.

8   RT 625, 677.  She heard more than ten shots.  RT 680.

9          Swafford was hit.  He pulled himself into his car.  RT 539.  Michel walked around

10  the car, opened the door and shot at Swafford.  RT 539, 633.  Swafford fell out of the car onto a

11  pile of glass.  RT 542.

12         Neither Swafford nor Tabarez recalled seeing petitioner at the scene.  RT 628,

13  694.  Although Trejo testified he had not seen petitioner at the scene, his testimony was

14  impeached by a prior statement to investigator William Deasy, in which he identified petitioner

15  as one of those present.  RT 1633-1634.

16         Sandra Luna, who lived three blocks south of Edinger Way, heard gunshots during

17  the early morning hours: a series of shots, then a pause and another series of shots, for about ten

18  total.  RT 362-363.

19         Around 1:30 a.m., Sacramento Police Sergeant David Torres heard a broadcast of

20  shots fired.  RT 372.  He arrived at 2634 Edinger Way and saw a brown Cadillac, parked the

21  wrong way in front of the house.  RT 374.  A man (Swafford) was hanging out of the passenger

22  side, unconscious, and one (Guerrero) was seated behind the steering wheel with a fatal bullet

23  wound to the back of his head.   RT 375, 834-835.

24  /////

25  /////

26  /////

1       While he was in the hospital, Swafford told his brother that Brown and Michel

2    "came out of the car just unloading on 'em." RT 726.  Swafford told Detective Richard Overton

3    that "Luis, Matt and Mikey" were responsible for the shooting; later he said Luis, Matt, Mikey

4    and John.  RT 736.

5       Over the course of several days of testimony, several criminalists testified that at

6    least nineteen shots were fired at the Cadillac from four different guns, a ten-millimeter handgun,

7    a nine-millimeter handgun, a .380 automatic pistol, and a .357 Magnum or .38 special.  RT 458-

8    459, 1042, 1084-1085.  Among the many bullets and fragments recovered from the Cadillac were

9    two fired from the ten-millimeter gun seized during Michel's arrest, one in the spare tire in the

10    trunk and one in the right rear tire.  RT 900-901, 1095.  This gun would not fire continuously

11    from pressure on the trigger, but rather required that the trigger be pulled and released with each

12    shot.  RT 1033-1034.

13       The bullet that killed Guerrero was probably fired from the nine-millimeter gun.

14    RT 1223-1224.  One of the bullets passed through his head; this wound was fatal.  RT 834-835.

15    The two bullets left in Swafford's body were probably .380 automatic bullets.  RT 1403, 1439.

16       Detective Richard Overton interviewed petitioner; the jury saw the videotape and

17    read the transcript of that interview.  RT 747.  Petitioner initially said he saw Little Mike

18    [Brown] push Maria into the car, heard gunshots and saw the flames from the muzzle, grabbed

19    the ten-millimeter from under the seat, put the clip in and fired into the air.  CT 1004.

20       Overton told him they had found bullets from the ten-millimeter in Swafford's car

21    and began again to ask petitioner about the incident.  CT 1023.  Petitioner conceded that

22    Swafford was "pissing everybody off" by his reckless driving and that his brother harbored a

23    grudge against Swafford as a result of the incident on Mother's Day.  CT 1036.  After they

24    parked at Virginia's and everybody got out, petitioner saw Swafford and his brother begin to

25    fight, so he ran back to the car; he heard gunshots and a lot of screaming as he ran.  CT 1039.

26    Petitioner got the ten-millimeter and began firing as he raised it into the air.  CT 1042-1043.  He

1   heard two shells make a "ding-ding" sound and thought they hit the ground; he realized that they

2   may have hit Swafford's car.  CT 1043.  Petitioner never saw Swafford or Guerrero with guns

3   that evening.  CT 1044.

4   II.  Standards Under The AEDPA

5            An application for a writ of habeas corpus by a person in custody under a

6   judgment of a state court can be granted only for violations of the Constitution or laws of the

7   United States.  28 U.S.C. § 2254(a).  Federal habeas corpus relief also is not available for any

8   claim decided on the merits in state court proceedings unless the state court's adjudication of the

9   claim:

10          (1) resulted in a decision that was contrary to, or involved an
            unreasonable application of, clearly established federal law, as
11          determined by the Supreme Court of the United States; or

12          (2) resulted in a decision that was based on an unreasonable
            determination of the facts in light of the evidence presented in the
13          State court proceeding.

14   28 U.S.C. § 2254(d) (referenced herein in as "§ 2254(d)" or "AEDPA").  See Ramirez v. Castro,

15   365 F.3d 755, 773-75 (9th Cir. 2004) (Ninth Circuit affirmed lower court's grant of habeas relief

16   under 28 U.S.C. § 2254 after determining that petitioner was in custody in violation of his Eighth

17   Amendment rights and that § 2254(d) does not preclude relief); see also Lockyer v. Andrade, 538

18   U.S. 63, 70-71 (2003) (Supreme Court found relief precluded under § 2254(d) and therefore did

19   not address the merits of petitioner's Eighth Amendment claim).[2]  Courts are not required to

20   address the merits of a particular claim, but may simply deny a habeas application on the ground

21   that relief is precluded by 28 U.S.C. § 2254(d).  Lockyer, 538 U.S. at 71 (overruling Van Tran v.

22

23          [2]  In Bell v. Jarvis, 236 F.3d 149, 162 (4th Cir. 2000), the Fourth Circuit Court of Appeals
     held in a § 2254 action that "any independent opinions we offer on the merits of constitutional
     claims will have no determinative effect in the case before us . . .  At best, it is constitutional
24   dicta."  However, to the extent Bell stands for the proposition that a § 2254 petitioner may obtain
     relief simply by showing that § 2254(d) does not preclude his claim, this court disagrees.  Title
25   28 U.S.C. § 2254(a) still requires that a habeas petitioner show that he is in custody in violation
     of the Constitution before he or she may obtain habeas relief.  See Lockyer, 538 U.S. at 70-71;
26   Ramirez, 365 F.3d at 773-75.

1   Lindsey, 212 F.3d 1143, 1154-55 (9th Cir. 2000) in which the Ninth Circuit required district

2   courts to review state court decisions for error before determining whether relief is precluded by

3   § 2254(d)).  It is the habeas petitioner's burden to show he is not precluded from obtaining relief

4   by § 2254(d).  See Woodford v. Visciotti, 537 U.S. 19, 25 (2002).

5          The "contrary to" and "unreasonable application" clauses of § 2254(d)(1) are

6   different.  As the Supreme Court has explained:

7          A federal habeas court may issue the writ under the "contrary to"
           clause if the state court applies a rule different from the governing
8          law set forth in our cases, or if it decides a case differently than we
           have done on a set of materially indistinguishable facts.  The court
9          may grant relief under the "unreasonable application" clause if the
           state court correctly identifies the governing legal principle from
10         our decisions but unreasonably applies it to the facts of the
           particular case.  The focus of the latter inquiry is on whether the
11         state court's application of clearly established federal law is
           objectively unreasonable, and we stressed in Williams [v. Taylor,
12         529 U.S. 362 2000)] that an unreasonable application is different
           from an incorrect one.
13

14   Bell v. Cone, 535 U.S. 685, 694 (2002).  A state court does not apply a rule different from the

15   law set forth in Supreme Court cases, or unreasonably apply such law, if the state court simply

16   fails to cite or fails to indicate an awareness of federal law.  Early v. Packer, 537 U.S. 3, 8

17   (2002).

18          The court will look to the last reasoned state court decision in determining

19   whether the law applied to a particular claim by the state courts was contrary to the law set forth

20   in the cases of the United States Supreme Court or whether an unreasonable application of such

21   law has occurred.  Avila v. Galaza, 297 F.3d 911, 918 (9th Cir. 2002), cert. dismissed, 538 U.S.

22   919 (2003).  Where the state court fails to give any reasoning whatsoever in support of the denial

23   of a claim arising under Constitutional or federal law, the Ninth Circuit has held that this court

24   must perform an independent review of the record to ascertain whether the state court decision

25   was objectively unreasonable.  Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003).  In other

26   /////

1  words, the court assumes the state court applied the correct law, and analyzes whether the

2  decision of the state court was based on an objectively unreasonable application of that law.

3        It is appropriate to look to lower federal court decisions to determine what law has

4  been "clearly established" by the Supreme Court and the reasonableness of a particular

5  application of that law.  See Duhaime v. Ducharme, 200 F.3d 597, 598 (9th Cir. 1999).

6  III.  The Admissibility Of Petitioner's Statement To Overton

7        Petitioner argues that his statement to Overton should not have been admitted

8  because petitioner did not waive his Miranda[3] rights initially and he requested counsel during the

9  course of the interview.  He also argues that his statement was not voluntary because of

10  psychological trickery.  Respondent counters that this court cannot reach the first and third

11  grounds because the Court of Appeal rejected them on procedural grounds and the decision on

12  the second ground was not an unreasonable application of Supreme Court authority.

13      A.  Factual Background

14        At the beginning of the interview, Overton gave petitioner the standard Miranda

15  advisement, asking after each sentence whether petitioner understood each one.  CT 665-666.

16  Petitioner then began his account of the events at the baptism and the bar, but claimed he had left

17  the bar with a woman named Nicole and learned of the shooting through some telephone calls

18  and the newspaper account.  Overton noted that this was a murder investigation and "it's pretty

19  serious."  CT 699.  He asked petitioner how long he was facing for his supervised release

20  violation;[4] petitioner talked about spending some time in the halfway house and getting his life

21  back together.  CT 699-700.

22        Overton left the room; when he came back, he said, "It's not looking good.  Uh,

23  you really need to be truthful with me, guy."  CT 700.  He also commended petitioner for

24

25    [3]  Miranda v. Arizona, 384 U.S. 436 (1966).

26    [4]  Petitioner was on supervised release following a federal sentence for drug possession.

7

"having the balls to come down here." Id. Petitioner revised his account, admitting to being present during the shooting, but denying any part in the gunfire. Overton said that was closer to the truth, but he wanted to hear the truth from petitioner. CT 733-735. Petitioner continued with his account, continuing to deny that he had any part in the shooting. At one point, petitioner asked:

> Yeah. Well, what are – what – what charges am I looking at now though?
>
> OVERTON: Well, it's kind of tough for me to answer that when I haven't got the whole truth here, yet, --
>
> TAYLOR: Uh-huh.
>
> OVERTON: – John. Once we get the truth, --
>
> TAYLOR: Well, can I speak to an attorney before I answer the question of this one –
>
> OVERTON: If –
>
> TAYLOR: – to find out what he would –
>
> OVERTON: If you want to stop–
>
> TAYLOR: – have to tell me?
>
> OVERTON: –right now and have an attorney, we can stop now. I'm not going to –
>
> TAYLOR: Yeah, 'cause I don't want to dig myself into a hole before coming out with a shovel. I don't want to put myself into a position to where – 'cause I don't mind telling you that, yeah, I shot in the air. I shot – I shot how many–whatever you got on the casings. I did that because I was scared 'cause I seen my brother getting ready to fight with that guy. And, um, after I heard all the gunshots, you know, I turned around and came up. And, um, the gun was under the seat. And I ran back, and I – and– and–
>
> OVERTON: Hmm.
>
> TAYLOR: –the clip was out of it. And I put the clip up . . . And, you know, – and just fired it.
>
> OVERTON: Uh-huh.

/////

TAYLOR: Obvious – obviously, I unloaded the clip because that was the first time I ever fired a gun, you know.  I fired the gun in the air because I was scared.  I wanted everybody to stop. . . . By then it was too late.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

OVERTON: Okay.  Well, um, let's– let's– let's deal with this.  Uh, five, ten seconds ago you said that before you talked about that you wanted an attorney.

TAYLOR: Uh-huh.

OVERTON: Okay.  And –

TAYLOR: Well, it don't matter now.  'Cause I'd of told my attorney, and he would have told you guys the same thing. So–. . . . That's just a waste of time.

CT 781-783.  Overton complimented petitioner on his desire to tell the truth, then said:

[L]et's . . . do this because I want to make sure you understand the whole picture here. . . . Okay, now, just a second ago, you told me that, well, I don't want to talk about this without an attorney. . . . If that's the way you feel, you're perfectly within your right to . . . say that.

TAYLOR: Uh-huh.

OVERTON: And I have to stop.  And I'll just pack up my stuff. And I'm going to go out, and then we do the paperwork.  And – . . . and that's it.  And – and–and that's all there is to be said about it.

TAYLOR: Uh-huh.

OVERTON: Okay.  On the other hand, if you want to get this out in the open, you want me to be able to put down on paper and I can go over with you to make sure that what I put down is – is what you're saying happened. . . then that way, like I said earlier, I can go into a court of law, and I can say, yes.  On this date we sat down, and this is what he told me as opposed to somebody else guessing. . . .  But at . . . this point, you've kind of put a monkey on my back. . . . You ... said that you wanted an attorney.  And you're perfectly within your right to do that.  But if on the other hand, you want to say, no, forget that; I don't want an attorney; I want to talk about this, we can do that too.

TAYLOR: Uh-huh.

/////

9

OVERTON: The ball's in your court as to what you want to do here.

TAYLOR: Um, --

OVERTON: I mean, I'll be honest with you.  I'd like to get your side of the story.  I mean, you just said that, yeah, you shot the gun up in the air.

TAYLOR: Uh-huh.

OVERTON: I mean, there's some questions I'd like to ask you about that and get a clear picture in my head.

TAYLOR: Well, yeah.  I guess you can –

OVERTON: But –

TAYLOR: I don't need an attorney here because –

OVERTON: Well, I don't want you to guess.  I – I want you to think about this, you know. . . .I mean, you can have one, or you can say, no, forget it.  Let's just work through this. . . . It's up to you.

TAYLOR: Yeah.  I think I'll have one just in case I don't – if – if I don't – I don't want to – I want to – before he – I would just want him to overview things.

OVERTON: Okay.  Well, he's going to get a copy of everything.

TAYLOR: Hmm.

OVERTON: That – I mean, everything I write up, he's going to get a copy of it.

TAYLOR: Oh, okay.  Well, then that will work then too.

OVERTON: Well, you know, I don't want to put words in your mouth.  I'm a little confused –

TAYLOR: Uh-huh.

OVERTON: – as to whether you want to talk to me –

TAYLOR: Well, yeah.  As long as he –

OVERTON: – or not.

TAYLOR:  But I know once I tell you something, it's going to be down on paper, and I won't be able –

1       OVERTON: It –

2       TAYLOR:  – to change my statement, so I don't want to change – I
don't – I'll just – in front of him, I'll tell you the same thing.  Yeah,
3       I shot the gun.  And, as far as I know from what my brother says,
you know, he told me himself that he – he shot the guy that he shot
4       because he was scared.  Now as far as me seeing that, you know, I
don't know.  I never seen him pull the gun out, but heard all the
5       gunshots.  And, you know, I kind of – I'm not stupid.  I kind of
figured out it was coming from over there where they were arguing
6       and fighting.  And that's when I just, you know, – I pulled the gun
out, and it went off.  I shot it in the air because, um, you know, –
7       but I never shot anybody with the gun.  I – you know, I'm not that
stupid.  I didn't point the gun at none–nobody there and shoot it in
8       the air or point it into their face.

9  CT 785-789.  Petitioner continued his account, denying that he shot anybody.  Overton said he

10  had more questions, but could not ask them "unless you want to talk to me."  CT 793.

11       OVERTON:  Uh, but I want to know if it's okay if we talk, or if
you want to say, no, I want an attorney.
12
        TAYLOR: Oh.  No.  It's okay that we talk.
13
        OVERTON: Okay.  Uh, bear with me on this.  Okay. . . . Just
14       because I want to make sure that you don't think that I'm trying to
trick you or anything here. . . . Okay.  You said you wanted an
15       attorney.  Now you're saying, no, we can go ahead and talk and –
and–and get this all out on paper . . . and get your side of the story.
16       And I appreciate that.

17       TAYLOR: Uh-huh.

18       OVERTON:  That's –that's what I'd like to do is just get
everything you say down on paper, and that way I can tell
19       everything, well, this is what John told me. . . . But just to make
sure that everything, uh, looks right, . . . let me advise you of your
20       rights again.

21       TAYLOR: Okay.

22  CT 793-794.  Overton once again read the <u>Miranda</u> warnings to petitioner and asked if petitioner

23  wanted to talk to him.  Petitioner began, "About the whole involvement?"  CT 795.  Overton

24  stopped him:

25       But, I mean, for me to – to ask you some more questions, that's
okay?
26

1        TAYLOR: Yeah, I –

2        OVERTON: Without an attorney?

3        TAYLOR: I don't mind.  Yeah.

4   CT 795-796.

5        The trial court held an evidentiary hearing on petitioner's motion to exclude his

6   statement.  RT 96.  The only witness was detective Overton, who had interviewed petitioner.

7   RT 96-97.  Although he did not recall for certain, Overton believed he told petitioner that "his

8   name had come up in a shooting investigation," though Overton acknowledged he may have been

9   a little vague initially about his interest in interviewing petitioner.  RT 98, 121.  Overton read

10  petitioner the Miranda warnings from a card and petitioner "indicate[d] that he wanted to talk."

11  RT 100.  Overton had not threatened or manhandled petitioner.  Id.

12       When petitioner said that maybe he should have an attorney, Overton did not

13  respond right away, but rather let petitioner "talk[] for several minutes," while saying things like

14  "uh-huh, all right. . .acknowledging what he was saying."  RT 101.  During this period, Overton

15  did not ask petitioner any questions.  RT 111.  Overton thought that petitioner had not made an

16  unequivocal invocation at that point, particularly because petitioner said he wanted an attorney

17  "to overview things."  RT 115, 117-118.

18       Eventually, Overton decided he should clarify whether petitioner did want

19  counsel.  RT 101, 115.  He asked if petitioner wanted to continue to talk without an attorney;

20  petitioner said yes.  RT 101.

21       Counsel argued that the entire statement should be excluded because Overton was

22  aware that petitioner was represented by counsel on the federal proceedings and was obliged to

23  ask petitioner whether he wanted counsel present.  RT 128.  He also argued that the interview

24  was a "sham," because Overton led petitioner to believe that the interview was about the federal

25  warrant.  RT 129.  Finally, the statement should be excluded, counsel argued, because Overton

26  /////

1    did not make it clear that he was asking questions about anything but petitioner's federal

2    troubles.  RT 129.

3             Counsel also argued that at least the portion of the statement after petitioner

4    mentioned his federal lawyer or after he asked for a lawyer should be excluded.  RT 130-131.

5             The trial court denied the motion, finding that petitioner was equivocal because

6    "he continued to talk to the detective in a narrative fashion" after he mentioned an attorney,

7    demonstrating his willingness to continue talking.  RT 136-139.

8        B.  Court Of Appeal Decision

9             The California Court of Appeal rejected petitioner's challenge to the admission of

10   his statement:

11            Defendant Taylor contends the admissions he made to Detective
             Overton were admitted in violation of *Miranda* because he did not
12            waive his rights, they were coerced, and were made after he
             requested an attorney.  The People argue the first two claims have
13            been waived because Taylor failed to raise them below, and the
             third claim has no merit because Taylor failed to unequivocally
14            assert his right to an attorney.

15            Defendant Taylor filed a motion for continuance that included a
             statement alluding to a motion to suppress his statement in
16            violation of his constitutional rights, including but not limited to,
             *Miranda v. Arizona* . . . and *Edwards v. Arizona* . . . . At the
17            hearing on the motion, . . .  The defense . . .made the following
             three arguments in support of the motion: (1) the whole statement
18            must be suppressed because Overton did not clarify Taylor's
             representation by a lawyer in the federal case, as required by
19            *Edwards* and *Massiah v. United States* . . . . ; (2) the interview was
             "a ruse, or a disguise or a sham," purporting to be about the federal
20            warrant but was in reality an interview about Taylor's role in the
             instant case; and (3) Overton failed to cease questioning after
21            Taylor requested an attorney.

22            Defendant failed to claim either in his written or oral presentations
             to the court, that he did not waive his constitutional rights as
23            required by *Miranda*, or that his statements were coerced.  He has
             therefore waived those two issues on appeal. . . .
24
             . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
25   /////

26   /////

13

Under *Miranda*, once a suspect effectively waives his right to counsel, law enforcement officers are free to question him.  (*North Carolina v. Butler* (1979) 441 U.S. 369, 372-276 [sic]. . . . However, if a suspect indicates in any manner and at any stage of the process, prior to or during questioning, that he or she wishes to consult with an attorney, the suspect may not be interrogated. (*Edwards v. Arizona, supra*, 451 U.S. at pp. 484-485 . . .; *People v. Crittenden* (1994) 9 Cal.4th 83, 128.)  This "'rigid' prophylactic rule" of *Edwards* requires the court to "determine whether the accused actually invoked his right to counsel."  (*Smith v. Illinois* (1984) 469 U.S. 91, 95 . . . .)  The inquiry is an objective one. (*Davis v. United States* (1994) 512 U.S. 452, 459 . . . .  "[T]he suspect must unambiguously request counsel" (*ibid*.) with sufficient clarity "that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney.  If the statement fails to meet the requisite level of clarity, *Edwards* does not require that the officer stop questioning the suspect."  (*Ibid*.; *People v. Crittenden, supra*, 9 Cal.4th at p. 129.)

In *Davis*, the suspect had waived his rights under *Miranda*, but an hour and a half into the interview, said "[m]aybe I should talk to a lawyer."  (*Davis, supra*, 512 U.S. at p. 455.)  The lower court found that remark was not a request for counsel and the Supreme Court found no reason to disturb that conclusion.  (*Id*. at p. 462 . . . .)

Moreover, a suspect "may indicate an unwillingness to discuss certain subjects without manifesting a desire to terminate 'an interrogation already in progress.'" (*People v. Silva* (1988), 45 Cal.3d 604, 629-630.)  Where a suspect refuses to answer individual questions without seeking to halt the interview, questioning may continue.  (*Id*. at p. 630; *Fare v. Michael C*. (1979) 442 U.S. 707, 727. . . .)

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Applying these principles, we conclude defendant Taylor did not unequivocally invoke his right to counsel.  Taylor was on federal probation and was aware of his *Miranda* rights.  Prior to questioning, Overton advised him of his rights and asked whether he felt like talking, whereupon defendant started to talk.  When Taylor asked "can I speak to an attorney before I answer the question of this one -," Overton attempted to clarify this ambiguous statement, asking Taylor, "[i]f you want to stop right now and have an attorney, we can stop now.  I'm not going to –" Taylor's response was to cut Overton off and continue talking, recounting in narrative form, and without any questions by Overton, how he fired a gun into the air at the scene of the shootings.  When he finished this narrative, Overton again raised the subject of Taylor's ambiguous request for an attorney.  Given

1
2
3

> another opportunity to request an attorney, Taylor did not do so, but dismissed it as a waste of time.  Overton asked Taylor two more times whether he wanted an attorney and both times Taylor indicated he did not.

4
5
6
7
8
9
10
11

> In sum, we find Taylor's statement about speaking to an attorney was not an unambiguous request for an attorney, but rather an inquiry as to whether he could speak to an attorney before answering a particular question.  More importantly, Taylor did not stop talking after making the inquiry, but continued to speak about shooting into the air.  Overton asked no questions until Taylor's narrative ceased, at which time Overton clarified several times that Taylor did not wish to speak to an attorney and wished to continue speaking to Overton.   Thus, based on Taylor's equivocal request to speak to an attorney, Overton's clarification of that right, Taylor's continued narration without being questioned, Overton's repeated reiteration of Taylor's rights, and Taylor's repeated desire to keep talking without an attorney, we find, as did the trial court, that Taylor did not "express [a] present lack of willingness to discuss his case" and therefore did not invoke his right to counsel under *Edwards*.

12  Answer, Ex. C (Court of Appeal decision) at 16-23.

13        C. <u>Procedural Default</u>

14        A federal court will not review a claim of federal constitutional error raised by a

15  state habeas petitioner if the state court determination of the same issue "rests on a state law

16  ground that is independent of the federal question and adequate to support the judgment."

17  <u>Coleman v. Thompson</u>, 501 U.S. 722, 729 (1991).  This rule also applies when the state court's

18  determination is based on the petitioner's failure to comply with procedural requirements, so

19  long as the procedural rule is an adequate and independent basis for the denial of relief.  <u>Id</u>. at

20  730.  For the bar to be "adequate," it must be "clear, consistently applied, and well-established at

21  the time of the [] purported default."  <u>Fields v. Calderon</u>, 125 F.3d 757, 762 (9th Cir. 1997).  For

22  the bar to be "independent," it must not be "interwoven with the federal law."  <u>Michigan v. Long</u>,

23  463 U.S. 1032, 1040-41 (1983).  If an issue is procedurally defaulted, a federal court may not

24  consider it unless the prisoner can demonstrate cause for the default and actual prejudice as a

25  result of the alleged violation of federal law, or demonstrate that failure to consider the claims

26  will result in a fundamental miscarriage of justice.  <u>Coleman</u>, 501 U.S. at 749-50.

1        In Bennett v. Mueller, 322 F.3d 573, 586 (9th Cir.), cert. denied sub nom., Blanks

2   v. Bennett, 540 U.S. 938 (2003), the Ninth Circuit held:

3           Once the state has adequately pled the existence of an independent
            and adequate state procedural ground as an affirmative defense, the
4           burden to place that defense in issue shifts to the petitioner. The
            petitioner may satisfy this burden by asserting specific factual
5           allegations that demonstrate the inadequacy of the state procedure,
            including citation to authority demonstrating inconsistent
6           application of the rule. Once having done so, however, the ultimate
            burden is the state's.

7

8        Respondent contends that California's contemporaneous objection rule is an

9   adequate and independent state ground that prevents this court from reaching all but petitioner's

10  Edwards claim.

11       Under California law, a judgment may not be reversed by reason of the erroneous

12  admission of evidence unless "[t]here appears of record an objection to or a motion to exclude or

13  to strike the evidence that was timely made and so stated as to make clear the specific ground of

14  the objection or motion." Cal. Evid. Code § 353(a).  As the California Supreme Court has

15  explained:

16          What is important is that the objection fairly inform the trial court,
            as well as the party offering the evidence, of the specific reason or
17          reasons the objecting party believes the evidence should be
            excluded, so the party offering the evidence can respond
18          appropriately and the court can make a fully informed ruling.  If the
            court overrules the objection, the objecting party may argue on
19          appeal that the evidence should have been excluded for the reason
            asserted at trial, but it may not argue on appeal that the court
20          should have excluded the evidence for a reason different from the
            one stated at trial.

21

22  People v. Partida, 37 Cal.4th 428, 435 (2005); see also People v. Kennedy, 36 Cal.4th 595, 612

23  (2005), cert. denied, ___ U.S. ___, 126 S. Ct. 1781 (2006) (defendant forfeited his claim that

24  witness's testimony was coerced by failing to object at trial).

25       In Melendez v. Pliler, 288 F.3d 1120, 1125 (9th Cir. 2002), the Ninth Circuit held

26  that California's contemporaneous objection doctrine is clear, well-established and has been

                                          16

1   consistently applied when a party has failed to make any objection to the admission of evidence.

2   And in Jaiceris v. Fairman, 290 F.Supp.2d 1069, 1078 (N.D. Cal. 2003), the district court found

3   that when an objection is made, but not on the grounds later urged on appeal, "for the purposes of

4   preserving the . . . claim there might as well have been no objection at all."

5           The Jaiceris court's reasoning seems to square with the purpose behind Evidence

6   Code section 353 as it has been explained by the California courts: if the objection is not made

7   on the grounds later raised, it prevents the trial court and the parties from addressing the kernel of

8   the argument just as though no objection was made.  Petitioner has made no showing of the

9   inadequacy of the bar nor has he provided any cause for trial counsel's failure to raise these

10  particular challenges below.

11          Because the Ninth Circuit has found the contemporaneous objection rule to be an

12  adequate procedural bar, it operates to bar this court from addressing the merits of petitioner's

13  claims that his statement was not preceded by an explicit Miranda waiver and was involuntary.

14      D.  Invocation Of The Right To Counsel

15          Beginning with the now-familiar Miranda v. Arizona, 384 U.S. 436 (1966), the

16  Supreme Court has explored the impact of the Fifth Amendment's right to remain silent on

17  police interrogation of a suspect.  In Miranda, the court held that police must notify a suspect of

18  his right to remain silent and to secure the assistance of counsel before a custodial interrogation

19  and that if the accused requests the presence of a lawyer, "the interrogation must cease until an

20  attorney is present."  Id. at 474.

21          In Edwards v. Arizona, 451 U.S. 477 (1981), the Court considered the police

22  response to a suspect's invocation of his right to counsel.  In the first interrogation, Edwards, the

23  suspect asked for counsel and the police ended the interview.  The next day, different officers

24  visited Edwards at the jail, Mirandized him again, and secured an inculpatory statement.  He

25  unsuccessfully sought to suppress it, arguing that his Miranda rights had been violated.  The

26  Court held:

17

> [W]e now hold that when an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded further to police-initiated custodial interrogation even if he has been advised of his rights.  We further hold that an accused, such as Edwards, having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police.

Id. at 484-85.  The Court found that Edwards' statement made in the absence of counsel did not constitute a valid waiver.  Id. at 487.

The court revisited Edwards in Smith v. Illinois, 469 U.S. 91 (1984).  During the Miranda advisement, the suspect told police that he had been advised to get a lawyer because the police would railroad him; when told he had the right to counsel, he said "I'd like to do that;" when asked if he wanted to talk without the presence of a lawyer, he said "yeah and no;" and then finally agreed to talk without a lawyer.  Id. at 93.  The Supreme Court explained that the Edwards inquiry had two steps: first, did the suspect actually invoke the right to counsel and second, if there was an invocation, did the suspect thereafter initiate further conversation and waive counsel.  Smith, 469 U.S. at 95.  The Illinois courts found his requests for counsel had been ambiguous when considered in total. The Supreme Court reversed:

> Where nothing about the request for counsel or the circumstances leading up to the request would render it ambiguous, all questioning must cease.  In these circumstances, an accused's subsequent statements are relevant only to the question whether the accused waived the right he had invoked.  Invocation and waiver are entirely distinct inquiries, and the two must not be blurred by merging them together.

Id. at 98.  The Court emphasized, however, that the decision "is a narrow one," for it did not

> decide the circumstances in which an accused's request for counsel may be characterized as ambiguous or equivocal as a result of events preceding the request or of nuances inherent in the request itself, nor do we decide the consequences of such ambiguity or equivocation.

Id. at 99-100.

The impact of "ambiguity or equivocation" has been explored in two cases.  In Connecticut v. Barrett, 479 U.S. 523, 526 (1987), the suspect told police that he would not give a written statement without the presence of his lawyer, but had no problem talking about the incident.  The Supreme Court found the use of the suspect's oral statements at trial did not violate his Fifth Amendment rights.

> Barrett's limited requests for counsel . . . were accompanied by affirmative announcements of his willingness to speak with the authorities.  The fact that officials took the opportunity provided by Barrett to obtain an oral confession is quite consistent with the Fifth Amendment.  *Miranda* gives the defendant a right to choose between speech and silence, and Barrett chose to speak.

Id. at 529.  The Court found that Barrett's invocation was not ambiguous:  "Barrett made clear his intentions, and they were honored by police."  Id.

Finally, in Davis v. United States, 512 U.S. 452, 454-55 (1994), Navy investigators gave Davis Miranda warnings and began to question him about a homicide.  About an hour-and-a-half into the questioning, Davis said, "'Maybe I should talk to a lawyer.'"  The investigators sought to clarify whether he was asking for a lawyer or just making a comment.  Davis said he did not want a lawyer, the investigators Mirandized him again, and the interrogation continued for another hour until Davis said, "'I think I want a lawyer before I say anything else.'"  Id. at 455.  His later motion to suppress the statements was denied.

The Davis court thus focused on the first Edwards inquiry—whether the accused has actually invoked his right to counsel–which it found to be an objective one.  Id. at 459.  The Court observed:

> [I]f a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel, our precedents do not require the cessation of questioning.

> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

/////

1    [T]he suspect must unambiguously request counsel.  As we have
2    observed, "a statement is such an assertion of the right to counsel
     or it is not."

3    . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

4    If the statement fails to meet the requisite level of clarity, *Edwards*
5    does not require that the officers stop questioning the suspect.

6    Id. at 459 (emphasis in original; internal citation omitted).  It upheld the lower courts'

7    determination that Davis's statement was not an invocation of his right to counsel.

8           What the Ninth Circuit has deemed ambiguous or equivocal are qualified

9    requests: "I think I would like to talk to a lawyer," Clark v. Murphy, 331 F.3d 1062, 1070 (9th

10   Cir.), cert. denied, 540 U.S. 968 (2003); "but, excuse me, if I am right, I can have a lawyer

11   present through all this, right?" United States v. Younger, 398 F.3d 1179, 1187 (9th Cir. 2005).

12   In this case, petitioner's second reference to a lawyer---- "I think I'll have one just in case. . . ."

13   is equivocal, just as those in Davis, Clark, and Younger were.

14          Petitioner's first statement about counsel, however, is different: petitioner asked

15   "can I speak to an attorney," an apparently unqualified request.  However, this court has watched

16   the videotape of petitioner's statement, Pretrial Exhibit A, lodged as part of the record in this

17   case.  It reflects what the state Court of Appeal described: without giving Overton a chance to

18   respond to his question, petitioner continued talking about the events of the evening, conceding

19   that he had fired the gun in the air.  See CT 781-783 & Pretrial Ex. A.  When Overton reminded

20   him that "five, ten seconds ago," petitioner had asked for a lawyer, petitioner said "it don't matter

21   now."  CT 783.  A minute or so later, petitioner said Overton could ask him questions because he

22   did not need an attorney but then said "I think I'll have one just in case . . . ."  CT 787.  When

23   Overton said he was confused about petitioner's desire to have a lawyer before everything was

24   "down on paper," petitioner said "I'll tell you the same thing" and returned to his account of the

25   incident.  CT 788-789.  Overton Mirandized petitioner once again and petitioner then said, "I

26   don't mind" talking without the presence of counsel.  CT 796.  As the tape reflects, petitioner's

1  comments about a lawyer were followed immediately by his continued narration of his role in the

2  shooting.

3          In James v. Marshall, 322 F.3d 103, 105 (1st Cir. 2003), James called police and

4  reported he may have killed someone during a fight.  At the police station, Sergeant Craig read

5  James his Miranda rights; James said he would talk.  Craig took him to a conference room and

6  asked to videotape the interview; James said "sure," and he had "no problem" with that.  As the

7  taped interview began, Craig again Mirandized James and asked "do you wish to make a

8  statement at this time?"  James said "Nope."  Craig asked, "Can I talk to you about what

9  happened earlier tonight?"  James replied, "Yup."  Thereafter, James was cooperative and signed

10  Craig's notes after reviewing them for accuracy.  Id.

11          James challenged the admissibility of the statement, which was upheld by the

12  Massachusetts Supreme Judicial Court.  In his habeas petition, James argued that the state court's

13  consideration of his conduct and answers after he said "nope" violated Smith v. Illinois, supra,

14  which noted the relevance of ambiguities that precede a request or are part of the request itself,

15  but held that a court could not use later answers to cast retrospective doubt on the initial request.

16  469 U.S. at 100.

17          The First Circuit disagreed.  It found that the Supreme Judicial Court properly

18  considered James's willingness to talk before and after saying "nope" to determine that this

19  answer had been in fact ambiguous and then considered Craig's follow-up question, which was

20  not about the murder, as an appropriate way to determine whether James was in fact invoking his

21  right to counsel.  James, 322 F.3d at 109.

22          In Poyner v. Murray, 964 F.2d 1404, 1409 (4th Cir. 1992), after Poyner was

23  Mirandized and police described some of the information linking him to several murders, he

24  asked, "Didn't you say I have a right to an attorney?"  The officers confirmed this and began to

25  leave the room; Poyner then said, "Let me tell you about that car."

26  /////

1    The Fourth Circuit found that Poyner's comment about his right to counsel was

2    equivocal, a finding "bolstered by Poyner's actions."

> Poyner's obvious desire to prevent the detectives from leaving the
> room and to continue the questioning is wholly inconsistent with
> his present contention that he wanted to have an attorney present
> before further questioning.
>
> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
>
> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
>
> In this situation, the substance of the colloquy between police
> officer and subject taken as a whole is clearly relevant to a
> determination of whether the suspects' fifth amendment rights have
> been violated.  Moreover, the interests sought to be protected by
> the *Smith* decision–that the police should not be allowed to "wear
> down" the accused by post-request badgering–simply are not
> implicated where a request for clarification of the right to counsel
> is immediately followed by both volunteered and responsive
> incriminating statements.

13   Id. at 1411-12.

14    As the James and Poyner courts observed, the determination as to whether a

15   suspect's statement is an invocation of the right to counsel is an objective one, which includes a

16   consideration of the context in which the statement was made.  In this case, petitioner's question

17   about counsel was followed without interruption by his account of shooting in the air after the

18   melee began.  Although petitioner's question about counsel seems clear in isolation, his

19   immediate jump from the statement about counsel to the statement about the events shows that "a

20   reasonable officer in light of the circumstances would have understood only that the suspect

21   *might* be invoking the right to counsel."  Davis, 512 U.S. at 459.

22    The state Court of Appeal's reliance on the context to find that petitioner's request

23   was equivocal was not an unreasonable application of clearly established federal law.

24   IV.  Ineffective Assistance Of Trial Counsel

25    Petitioner alleges trial counsel was ineffective in failing to call Maria Aguilar as a

26   defense witness because Aguilar, who was like a sister to the four co-defendants, "would have

1   substantiated the fact" that she attacked Swafford for his reckless driving, that Swafford

2   "knock[ed] her senseless."  The four defendants' response to the attack on Aguilar, petitioner

3   reasons, would then be seen as imperfect defense of others.  Pet. at 5i-5j.

> The federal law on claims of attorney ineffectiveness is clear:
> First, the defendant must show that counsel's performance was
> deficient.  This requires showing that counsel made errors so
> serious that counsel was not functioning as the "counsel"
> guaranteed by the Sixth Amendment.  Second, the defendant must
> show that the deficient performance prejudiced the defense.

8   Strickland v. Washington, 466 U.S. 668, 687 (1984).  "[T]he performance inquiry must be

9   whether counsel's assistance was reasonable considering all the circumstances."  Id. at 688.

10  Certainly, one of counsel's duties is investigation, but "the duty to investigate and prepare a

11  defense is not limitless: it does not necessarily require that every conceivable witness be

12  interviewed" and such claims "must be considered in light of the strength of the government's

13  case."  Bragg v. Galaza, 242 F.3d 1082, 1088, as amended on denial of rehearing, 253 F.3d 1150

14  (9th Cir. 2001) (internal quotations, citations omitted).  Petitioner cannot bear his burden of

15  showing ineffective assistance of counsel by presenting "mere conclusory statements," United

16  States v. Schaflander, 743 F.2d 714, 721 (9th Cir. 1984), but rather must tender affidavits from

17  the witnesses counsel neglected to interview or call, showing the "helpful testimony for the

18  defense" they could have presented.  Dows v. Wood, 211 F.3d 480, 486 (9th Cir. 2000); Bragg,

19  242 F.3d at 1088.

20          It is also petitioner's burden to establish prejudice:  "A defendant must show that

21  there is a reasonable probability that, but for counsel's unprofessional errors, the result of the

22  proceeding would have been different.  A reasonable probability is a probability sufficient to

23  undermine confidence in the outcome."  Strickland, 466 U.S. at 694.

24          Petitioner has not borne his burden of showing that trial counsel's actions were

25  outside the range of professional competence, for he has not included a declaration or statement

26  /////

1   from Maria Aguilar.  His speculation about what she would have said if called as a witness will

2   not suffice.

3   V.  Sufficiency Of The Evidence

4             Petitioner also argues that the evidence was insufficient to show he acted as an

5   aider and abettor or conspirator in the murder of Guerrero and the attempted murder of Swafford.

6             The Court of Appeal rejected his argument:

7             Defendants were charged with the attempted murder of Robert
              Swafford (Count 2) and the murder of Chris Guerrero (Count 1).  It
8             was the prosecution's theory that all three defendants conspired to
              shoot Robert Swafford with the intent to kill him, and that one of
9             the bullets meant for Swafford hit Chris Guerrero in the head,
              killing him while he was sitting in the driver's seat of Swafford's
10            car.  Because the prosecutor was unable to prove who actually shot
              the fatal bullet, he argued the jury could find defendants guilty of
11            murder and attempted murder on either a theory of aiding or
              abetting or conspiracy.
12
              We find there is substantial evidence that defendants aided and
13            abetted the attempted murder of Swafford and the murder of
              Guerrero, and for that reason we review the evidence in the record
14            drawing the inferences which support that legal theory.

15            . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

16            . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

17            The jury found defendant Brown guilty of the second degree
              murder of Chris Guerrero and the attempted murder of Robert
18            Swafford. . . .  The night of the shooting, the defendants, including
              Brown, attended a baptism celebration and a party at Yolanda's
19            Lounge.  The defendants then decided to follow Swafford to
              Nuno's residence.
20
              Defendants drove to the Nuno residence in two cars.  Brown drove
21            the Geo with Aguilar and Trejo as passengers, while Carrillo drove
              his own car with Michel and Taylor as passengers, following
22            Swafford as agreed.  Upon arrival at Nuno's residence, Swafford
              parked the Cadillac on the wrong side of the street, Carrillo parked
23            his car across the street from and to the rear of the Cadillac, and
              Brown parked Aguilar's car right behind the Cadillac.

24   /////

25   /////

26   /////

Carrillo rushed over to the Cadillac, urging Nuno to get out of the car while berating Swafford for his driving.  Once Nuno was out of the car, Carrillo continued to argue with Swafford, at which time defendant Michel exited Carrillo's car, walked toward Swafford, and shot at him with one gun.  At about the same time, Swafford also saw defendant Brown shoot at him.  Meanwhile, hearing gunfire, Taylor took the ten-millimeter . . . fitted it with a loaded clip and began firing at the car, hitting the trunk and flattening the right rear tire. . . .

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

The ballistics evidence established at least 19 shots were fired at Swafford's Cadillac.  Of those 19 shots, at least four different weapons were used to fire four different style bullets of different calibers. . . .  While the bullet that killed Guerrero was never identified, expert testimony established Swafford was hit by at least three different style bullets from three different caliber weapons. . . .A diagram of the crime scene . . . shows that, with two possible exceptions, none of the shots from different caliber weapons were fired on parallel tracks, suggesting that each gun was shot by a separate gunman rather than one gunman firing two different caliber guns.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

As with Brown, the jury also found Taylor guilty of second degree murder and attempted murder. . . . specific evidence relating to Taylor established the following:

Taylor was Michel's half-brother, and while he was not present at the Folsom Lake barbecue, by his own admission, he had heard about the argument and was of the belief that Swafford "had tried to whoop on him [Michel] one time before. . . ."  Swafford identified Taylor as one of the shooters.  In his interview with Detective Overton, Taylor admitted the defendants had agreed to follow Swafford to Nuno's residence, he traveled to the scene of the shooting in Carrillo's car, he was present at the scene of the shootings, and fired a gun into the air.  According to Taylor, when he heard "all the gunshots," he grabbed the ten-millimeter gun from under the seat of Carrillo's car, put the clip in, and fired all the bullets in the clip into the air because he was "scared" and he "wanted everybody to stop."  However, after being told the evidence established the gun he used was fired into the car, Taylor changed his story and said he pointed the gun down at first and that he must have hit the car as he raised the gun to shoot into the air. He thought he heard two bullets hit the ground but admitted they may have hit the car.  Moreover, Taylor described the gun he fired as going "boom-boom-boom", although the test-firing of the gun

established the ten-millimeter . . .did not have a hair trigger firing mechanism.  Rather, expert testimony established it could be fired either with a single action, requiring approximately a three-and-one-half to four-pound trigger pull, or a double action, requiring approximately an eight- to nine-pound trigger pull.  Thus, the weapon would only fire if the trigger was pulled and released with each shot.  Moreover, the ballistics evidence established that only one ten-millimeter weapon was used . . . .

Based upon all the evidence, the jury reasonably could have determined that because of the close relationship between Taylor and Michel, Taylor knew that Michel was very angry at Swafford, that the three defendants and Carrillo agreed to follow Swafford to Nuno's residence, that between those four individuals, there were at least four firearms, that Taylor knew the ten-millimeter gun was in Carrillo's car, that when he heard the shots being fired, he armed himself with the ten-millimeter gun and began firing at the Cadillac, emptying the clip and hitting the Cadillac twice, once in the trunk and once in the back tire, disabling the car and preventing an easy escape.  He also showed a consciousness of guilt when he initially lied to Detective Overton telling him that he only fired into the air and when he described a rapid-fire action on the gun he used.

Thus the jury could find Taylor was aware of a plan to shoot Swafford, and that when he saw the developing confrontation between Swafford and Carrillo and heard the gunshots, and chose to join the fray, he intended to aid Michel in his plan to kill Swafford.  The jury could also have inferred from the ballistics evidence alone–19 shots fired in close proximity by at least four weapons wielded by four gunmen, that there was a plan to shoot Swafford and that Taylor was aware of it.  Moreover, the jury could also reasonably find Taylor acted to facilitate the attempted murder of Swafford by shooting into the air to raise the victims' level of panic and confusion and to block their escape through the barrage of bullets that was being rained upon them.

For the same reasons discussed above with respect to defendant Brown, there is substantial evidence that Taylor shared the intent to kill Swafford, that the murder of Chris Guerrero was a natural and probable consequence of the attempted murder of Swafford by shooting into the car occupied by Guerrero, and for that reason the jury could find that he aided and abetted second degree murder. . . . .

. . . Taylor argues the attempted murder conviction cannot stand because he did not inflict any of the injuries on Swafford or Guerrero and there is no evidence he intended to kill prior to or during the time Swafford was shot.  An aider and abettor need not be the actual perpetrator and need not share the perpetrator's specific intent to commit the target offense.  All that is required is

1
2
3
4
5
6

> proof the aider and abettor knew that a criminal act (here shooting at Swafford or into an occupied vehicle) was intended and that he acted to encourage or facilitate that criminal act.  An aider and abettor's intent must be formed prior to or during the commission of the offense.  However, this principle does not require the prosecution to prove Taylor fired the gun before either victim was injured where, as here, there is substantial evidence he formed the intent to aid and abet the target offense prior to or during the attack and promoted the commission of that attack by firing his gun during the attack.

7   Answer, Ex. C at 38-53 (footnotes and citations omitted).

8          In <u>Jackson v. Virginia</u>, the Supreme Court examined the role of a habeas court in

9   considering a challenge to the sufficiency of the evidence:

10
11
12

> [T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

13   443 U.S. 307, 319 (1979) (emphasis in original).

14          The Court continued:

15
16
17

> [A] federal habeas corpus court faced with a record of historical facts that supports conflicting inferences must presume – even if it does not affirmatively appear in the record – that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution.

18   <u>Id</u>. at 326.  Constitutionally sufficient evidence need not rule out every hypothesis except that of

19   guilt.  <u>Id.</u>  This court must apply the <u>Jackson</u> standard with "explicit reference to the substantive

20   elements of the criminal offense as defined by state law."  <u>Id</u>. at 324 & n.16.  Moreover, this

21   court must apply <u>Jackson</u> with an extra layer of deference to the state court's determination, as

22   mandated by the AEDPA.  <u>Juan H. v. Allen</u>, 408 F.3d 1262, 1274-75 (9th Cir. 2005), <u>cert.</u>

23   <u>denied</u>, __ U.S. __, 126 S.Ct. 1142 (2006).

24   /////

25   /////

26   /////

1    In California, an aider and abettor's liability for a crime arises in one of two ways:

2    First, an aider and abettor with the necessary mental state is guilty
     of the intended crime.  Second, under the natural and probable
3    consequences doctrine, an aider and abettor is guilty not only of the
     intended crime, but also "for any other offense that was 'a natural
4    and probable consequence' of the crime aided and abetted."  Thus,
     for example, if a person aids and abets only an intended assault, but
5    a murder results, that person may be guilty of that murder, even if
     unintended, if it is a natural and probable consequence of the
6    intended assault.

7    People v. McCoy, 25 Cal.4th 1111, 1117 (2001) (internal citation omitted).  Thus, to be guilty of

8    attempted murder as an aider and abettor when the natural and probable consequences doctrine

9    does not apply, "a person must give aid or encouragement with knowledge of the direct

10   perpetrator's intent to kill and with the purpose of facilitating the direct perpetrator's

11   accomplishment of the intended killing–which means that the person guilty of attempted murder

12   as an aider and abettor must intend to kill."  People v. Lee, 31 Cal.4th 613, 624 (2003).  To be

13   guilty of second-degree murder as an aider and abettor when the natural and probable

14   consequences doctrine does not apply, a person must give aid and encouragement with the

15   knowledge of the direct perpetrator's act with express malice (a deliberate intention unlawfully to

16   take away the life of a fellow creature) or implied malice (an intentional act, the consequence of

17   which is dangerous to life, deliberately performed with knowledge that the conduct endangers the

18   life of another and with conscious disregard for life) and with the purpose of facilitating that act.

19   People v. Robertson, 34 Cal.4th 156, 164 (2004) (elements of second degree murder); People v.

20   Beeman, 35 Cal.3d 547, 560 (1984) (aiding and abetting).

21        In this case, the jury was instructed on the natural and probable consequences of

22   aiding and abetting; the court identified the "target offense" as shooting into an occupied vehicle

23   in violation of California Penal Code § 246.  CT 443.  To be guilty of murder and attempted

24   murder as an aider and abettor under the natural and probable consequences doctrine in this case,

25   a person must knowingly and intentionally have aided another in shooting at an occupied car and

26   /////

                                                28

1    the other crimes must have been objectively foreseeable results of the underlying act.  People v.

2    Mendoza, 18 Cal.4th 1114, 1123 (1998); People v. Woods, 8 Cal.App.4th 1570, 1587 (1992).

3              Whether this court agrees that reasonable inferences support the conclusion that

4    petitioner shared his brother's intent to kill Swafford when he began to fire at Swafford's car and

5    into the air is irrelevant; a rational jury could have found that petitioner shared his brother's

6    intent to shoot into Swafford's occupied car.  California Penal Code § 246 is a general intent

7    crime, which is violated when a defendant intentionally discharges a firearm at an occupied car

8    or when a defendant shoots "in such close proximity to the target that he shows a conscious

9    indifference to the probable consequence that one or more bullets will strike the target or persons

10   in or around it."  People v. Overman, 126 Cal.App.4th 1344, 1356 (2005).  Petitioner's response

11   to the gunfire was to get yet another gun and begin shooting in the direction of the Cadillac,

12   where the others were shooting as well.  This supports the jury's conclusion that petitioner shared

13   his brother's intent to shoot into the car.

14            Moreover, a rational juror could conclude that the murder and attempted murder

15   were the natural and probable consequences of the target offense: a reasonable person could

16   foresee that injury and death could be the ultimate outcome of nineteen shots fired into a car in

17   which one person was sitting and one was seeking refuge.  RT 458-459, 1042, 1084-1085.

18   Accordingly, the state court did not fail to apply clearly established federal law in determining

19   that sufficient evidence supports petitioner's convictions.

20   VI.  Ineffective Assistance Of Appellate Counsel

21            Finally, petitioner argues that appellate counsel was ineffective by not challenging

22   trial counsel's failure to call Maria Aguilar as a witness.

23            The Strickland standards apply to appellate counsel as well as trial counsel.  Smith

24   v. Murray, 477 U.S. 527, 535-36 (1986); Miller v. Keeney, 882 F.2d 1428, 1433 (9th Cir. 1989).

25   In order to demonstrate prejudice in this context, petitioner must demonstrate that, but for

26   counsel's errors, he probably would have prevailed on appeal.  Miller, 882 F.2d at 1434 n.9.

1    Petitioner cannot bear his burden of showing prejudice; as noted above, he has not

2    presented Aguilar's declaration or otherwise demonstrated that her testimony would have been

3    favorable to his cause.

4    Accordingly, IT IS HEREBY RECOMMENDED that petitioner's application for a

5    writ of habeas corpus be denied.

6    These findings and recommendations will be submitted to the United States

7    District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within

8    twenty days after being served with these findings and recommendations, any party may file

9    written objections with the court and serve a copy on all parties.  Such a document should be

10    captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the

11    objections shall be served and filed within ten days after service of the objections.  The parties

12    are advised that failure to file objections within the specified time may waive the right to appeal

13    the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

14    DATED:  February 22, 2007.

15

16    _____

17    U.S. MAGISTRATE JUDGE

18

19

20

21

22

23

24    2/fran0477.157

25

26